UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BONNIE JO AMYETTE,

    Plaintiff/Counter-Defendant,

    v.

PROVIDENCE HEALTH SYSTEM dba
PORTLAND PROVIDENCE MEDICAL
CENTER,

    Defendant/Counter-Claimant.

Civil No. 06-1704-HA

OPINION AND ORDER

HAGGERTY, Chief Judge:

    Defendant has moved for summary judgment [16] in this action for discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*[1] Oral argument on the motion was heard October 26, 2007. After considering the arguments and evidence before the court, defendant's motion is granted.

---

[1] Defendant counterclaims for attorney fees.

1    - OPINION AND ORDER

I. **BACKGROUND**

On summary judgment, the court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The facts in the record upon which the court bases its conclusions are those referenced in the parties' concise statements of facts. *See* D. Or. R. 56.1(e) ("Except as otherwise required by law, when resolving a motion for summary judgment, the Court has no independent duty to search and consider any part of the court record not otherwise referenced in the separate concise statements of the parties.").

A. **Uncontested Facts**

Defendant hired Bonnie Jo Amyette in 1999, and in April 2005 she transferred to the Providence Histology Laboratory as a laboratory assistant. She had problems interacting with another laboratory assistant, Kay Andrew, who was rude to all of her coworkers, and particularly to plaintiff. In Fall 2005, plaintiff called Providence's Human Resources Consultant Marti Hanen to discuss Andrew, and was asked to submit her concerns in writing. On October 27, 2005, plaintiff's supervisor, Terry Wellen, requested Hanen's assistance in addressing tensions among laboratory assistants. Hanen interviewed laboratory assistants, many of whom complained about the use of "inappropriate tones" by some employees. On November 17, 2005, plaintiff submitted a five page report about the alleged conduct of Andrew and other employees. In her complaint, she stated that, "[s]ince I have started working in Histology, I have become a full-blown hypertensive that requires medication. . . . I have knots in my stomach, I am getting very little sleep, and started taking Prozac three weeks ago. Today, I met with a psychologist to talk about my depression concerns because I am a nervous wreck." Fisher Decl. Ex. 5. She did not discuss her medical condition with Hanen, other than to say that she was stressed and taking

medication. During the time that she worked for Providence, plaintiff never asserted that she was subject to disparate treatment because of disability.

By December 2005, plaintiff claims that she became hypertensive and depressed as a result of her interactions with Andrew. On December 6, 2005, while Hanen's investigation was ongoing, plaintiff took a medical leave of absence. Plaintiff also made a workers' compensation claim, asserting an injury in the form of stress caused by Andrew. Hanen's inquiry resulted in a conclusion that employees, primarily Andrew, had engaged in behavior that was inconsistent with Providence's standards. Hanen notified plaintiff of her findings in writing, and also notified her that Providence intended to respond through training, greater management involvement, and more staff meetings. Plaintiff agrees that those actions were an appropriate response to her complaint. Providence also issued a warning letter to Andrew for her behavior. On January 24, 2006, plaintiff's physician released her to work without restrictions, and she returned to work on February 8, 2006. When plaintiff returned to work, Susan Mullen was her new supervisor. Defendant agrees that Hanen and Mullen met with plaintiff on January 31, 2006, to discuss her return to work. They discussed adjusting the work schedule so as to minimize the time that plaintiff and Andrew overlapped. Mullen offered to help plaintiff whenever she needed it, expressed support for plaintiff, and shared a similar experience in her past.

During her last week at work, plaintiff never worked the same shift as Andrew. In the second week of February, plaintiff received notice that defendant's workers' compensation claims administrator had scheduled an independent medical examination. The examination was set for a time that plaintiff would not be at work: 2:00 p.m. on February 23, 2006. On February 20, 2006, plaintiff submitted a request not to work her late evening shift on February 23, 2006. The department was unable to find a replacement to work plaintiff's shift, and after consulting with

the operations manager, Mullen denied Amyette's request. Providence's written policy allows managers to deny time off requests based on staffing and the needs of the department. On February 21, 2006, plaintiff arrived at work and received written notice denying her request. Plaintiff became upset and decided to leave her job. She sent an e-mail explaining her reasons.[2] Plaintiff left work less than an hour after arriving, without speaking to her supervisor, and without making arrangements for a replacement to do her work. The only diagnosis that plaintiff shared with defendant before she left work was contained in the workers' compensation status reports related to her ability to return to work. Those reports reflected a diagnosis that plaintiff had an adjustment disorder, but had no restrictions, and could return to work.

An investigator interviewed plaintiff as part of her workers' compensation claim on December 13, 2005. The cover letter for the investigative report avers that the reason for the interview was that "[e]mployer doubts validity of claim." Fisher Decl. Ex. 6. Plaintiff attended the independent medical exam on February 23, 2006. The medical examiner diagnosed her as suffering from an adjustment disorder, but opined that it was unlikely to result in "permanent impairment." Fisher Decl. Ex. 23. Plaintiff received an initial notice of acceptance for her workers' compensation claim. *Id.* Ex. 24. After an independent medical examination on December 6, 2006, found plaintiff's condition to be stationary, her claim was closed in early 2007.

B.  **Contested Facts**

Although the parties agree on almost all of the facts, there are several points upon which

---

[2] In her e-mail, plaintiff complains that Andrew was given a day off earlier in the week, and that: "The denial of my request is VERY upsetting and stressful. I believe that the action is retaliatory! . . . You Win – I Quit!" Fisher Decl. Ex. 19.

their view of events differs. Those differences relate primarily to events at the meeting between plaintiff, Hanen, and Mullen before her return to work and defendant's awareness of plaintiff's alleged disability. Those differences are discussed in greater detail below.

Plaintiff claims that at the January 31, 2006, meeting with Hanen and Mullen, they agreed that she would have a maximum of one hour of scheduling overlap with Andrew. She also claims that she had shifts with four-hour overlaps with Andrew. Plaintiff also claims that soon after her return to work, she found herself reporting Andrew's behavior to Mullen. Defendant claims that plaintiff never complained that Andrew was repeating behavior that led to plaintiff's workers' compensation claim. Providence asserts that plaintiff simply sent an e-mail to Mullen on February 16, 2006, asking about how to perform a lab procedure because Andrew had expressed displeasure with the way that plaintiff was doing it. *See* Fisher Decl. Ex. 15 (e-mail).

Plaintiff also claims that Mullen offered assistance for her short term memory loss. Defendant disagrees, claiming that plaintiff had no limitation on her ability to perform essential job functions and that she never asked for an accommodation of any sort. Defendant claims that plaintiff never discussed her medical condition or related limitations with Mullen. Plaintiff also denies having any treatable medical condition. Plaintiff also claims that although she was cleared to return to work with no limitations by her doctor, this was only after he told her that she needed to "suck it up and go back to work." Amyette Dep. at 143.

Plaintiff has produced medical exhibits documenting her mental health problems, including: (1) a 2003 chart noting a history of hypertension and depression, Fisher Decl. Ex. 1; (2) November 15, 2005, chart notes from a consultation with a social worker, *id.* Ex. 2; (3) a December 14, 2005, physician's report diagnosing her with an adjustment order, *id.* Ex. 5; and (4) reports from January 2006, showing a similar diagnosis, *id*. Exs. 7- 9. Defendant does not

dispute that these various medical exhibits are authentic. Defendant does, however, claim that none of them were shared with Providence prior to plaintiff's departure. Further, defendant points to numerous places in plaintiff's deposition where she denied having any history of mental illness and downplayed the significance of medical records indicating the contrary. *See* Amyette Dep. at 191-92, 194-96, 200-04. Plaintiff has also produced a workers' compensation return-to-work slip dated February 14, 2006, which she claims shows that her diagnosis was not final as of January 24, 2006, when the same doctor told her that she could return to work on February 8, 2006. Fisher Decl. Exs. 9, 15. Plaintiff claims to have given this document to Mullen. Amyette Dep. at 217. The return-to-work letter lists no work restrictions for plaintiff. Fisher Decl. Ex. 15.

## II.  ANALYSIS

### A.  Summary Judgment Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). As noted previously, the court must view the facts and draw inferences in the manner most favorable to the non-moving party. *Diebold, Inc.*, 369 U.S. at 655. Defendant, the moving party, bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence of a genuine issue of material fact from the non-moving party. *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Anderson,* 477 U.S. at 248-49. There must be specific, admissible evidence identifying the basis for the dispute. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1980).

**B.     Discussion**

"The ADA provides that '[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability . . . .'" *Humphrey v. Memorial Hosps. Ass'n*, 239 F.3d 1128, 1133 (9th Cir. 2001) (quoting 42 U.S.C. § 12112(a)) (footnote omitted). Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id.* (quoting  42 U.S.C. § 12112(b)(5)(A)). In order to prove a claim for discrimination in violation of the ADA, a plaintiff must show that they are: (1) disabled; (2) qualified to perform the essential functions of the position; and (3) were subject to adverse employment action because of the disability. *Id.*

To be deemed disabled under the ADA, a plaintiff must have "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(a). "That these terms need to be interpreted strictly to create a demanding standard for qualifying as disabled is confirmed by the first section of the ADA, which lays out the legislative findings and purposes that motivate the Act." *Toyota Motor Mfg. v. Williams*, 534

U.S. 184, 197 (2002). In her response to defendant's motion, plaintiff repeats the mantra that she was disabled prior to ending her employment with defendant. However, in her opposition, she does not identify *any* major life activity in which she was actually impaired, or could colorably have been regarded as impaired by defendant.[3]

"[T]he ADA requires those 'claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial.'" *Id.* at 198 (quoting *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 565 (1999)) (alterations in original). To qualify as a disability, an "impairment's impact must also be permanent or long term." *Id.* When an impairment can be controlled by medication, as in the case of some mental impairments, the relevant inquiry is into the state of the individual when medicated. *See McAlindin v. County of San Diego*, 192 F.3d 1226, 1235-36 (9th Cir. 1999), *amended on denial of reh'g en banc*, 201 F.3d 1211 (2000) (examining the symptoms claimed by plaintiff "[d]espite the medications"). Here, the record on summary judgment shows that plaintiff's impairment during the time that she was employed by defendant was neither substantial nor long term, and that it was controlled by medication. Every doctor who treated Amyette opined that she could return to work with no limitations on her work activity. Further, although her doctors' notes indicated past depression and hypertension, she steadfastly denied those past diagnoses in her deposition. Plaintiff's job performance before and

---

[3] At oral argument, plaintiff asserted for the first time that she was disabled in the major life activity of working. Proof of disability in this particular major life activity requires a showing of significant restrictions in a broad range of jobs for which a plaintiff is qualified. *See Walton v. U.S. Marshals Serv.*, 492 F.3d 998, 1009 (9th Cir. 2007) ("[Plaintiff] must present specific evidence about relevant labor markets to defeat summary judgment and identify what requirements posed by the class of jobs were problematic in light of the limitations imposed on her.") (quotations and alterations omitted). The record here is devoid of any such showing.

8   - OPINION AND ORDER

after her leave of absence gave no indication that she was limited in any major life activity or unable to perform any aspect of the work.[4] Even assuming that defendant had access to doctors' files during this period, the record shows no genuine issue for trial on the question of whether plaintiff was disabled under the ADA.[5]

## III. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment [16] is GRANTED.

IT IS SO ORDERED.

DATED this  30  day of October, 2007.

    /s/ Ancer L. Haggerty
Ancer L. Haggerty
United States District Judge

---

[4] In light of the lack of any apparent disability, defendant was not, as plaintiff argues, required to engage in the "interactive process." *See Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000) (en banc), *vacated on other grounds*, 535 U.S. 391 (2002).

[5] Because the court finds that plaintiff is not disabled under the ADA, it does not address defendants alternate arguments that (1) defendant had no knowledge of plaintiff's disability; (2) plaintiff's failure to request an accommodation; or (3) lack of a constructive discharge.